## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**JAMES ROY TAYLOR**, and
**MARY ELIZABETH TAYLOR**,

Debtors.

Case No.  **08-60242-13**

## MEMORANDUM  OF  DECISION

At Butte in said District this 23rd day of October, 2008.

In this Chapter 13 case Debtors objected to Proof of Claim No. 6 filed by Dayspring

Restoration, Inc. ("Dayspring"), contending that Dayspring breached a contract with the Debtors

to repair and remodel Debtors' bathroom after damage from a water leak.  Dayspring filed an

amended claim acknowledging that its claim is unsecured, but requested full payment of its

invoice, interest and attorney fees and costs on the grounds Debtors did not object in writing

within the time provided under state law, Mont. Code Ann. ("MCA") § 28-2-2103(1)(b).  After

due notice a hearing on Debtors' objection was held at Missoula on September 11, 2008.

Debtors were represented by attorney Harold V. Dye ("Dye") of Missoula, Montana, and Debtor

1

Mary Elizabeth Taylor ("Mary") testified. Dayspring was represented by attorney Charles E. Hansberry ("Hansberry") of Missoula, Montana, and Dayspring's construction manager Larry Banister ("Banister") testified. Debtors' Exhibits ("Ex.") 1, 2, 3, and 4, and Dayspring's Ex. 2, 3-1, 4, 5, 7-1, 8-1, 8-2, 8-3, 8-4, 12-1, 12-3, 12-4, 12-5, and 12-6, all were admitted into evidence without objection. At the conclusion of the parties' cases-in-chief the Court closed the record and granted the parties time to file simultaneous briefs, which have been submitted and reviewed by the Court together with the record and applicable law. This matter is ready for decision. For the reasons set forth below a separate Order will be entered sustaining the Debtors' objection in part and denying it in part, and allowing Dayspring an unsecured nonpriority claim in the amount of $773.00, but denying both sides' requests for attorney's fees and costs under Montana's "American Rule."

This Court has jurisdiction of this case under 28 U.S.C. § 1334(a). Allowance or disallowance of Dayspring's claim against the estate is a core proceeding under 28 U.S.C. § 157(b)(2)(B). This Memorandum includes the Court's findings of fact and conclusions of law.

## FACTS

Debtors James Roy Taylor ("James") and Mary Taylors (together "Taylors" or "Debtors") suffered significant water damage to a bathroom in their home when their bathtub/shower separated from the drain[1]. Mary testified that they were insured with replacement coverage, and contacted their insurer[2]. She testified that the insurance company hired Dayspring to come to their house and address the water damage, and she thinks that Dayspring first came out to their

---

[1]Dayspring's Ex. 2 consists of photographs showing the water damage.

[2]Their insurer is named on Ex. 5-1 as Allied Insurance.

2

property in October of 2005.  Banister testified that Dayspring received a notice of loss and dispatched its emergency services crew to Taylors' house to stop the water leak and mitigate the damages.  Dayspring inspected the damage, put one dehumidifier in the bathroom which it left for about 4 days to dry out the water, and gave the Taylors a statement.

Dayspring's Ex. 3-1 is a "Work Authorization/Contract" dated 11/11/05 signed by Mary and Banister.  Banister testified that Ex. 3-1 is a form prepared by Dayspring.  He admitted that none of the three boxes on Ex. 3-1 next to "Authorization", "Charges", or "Other Costs" are checked or marked.  The first unmarked box on Ex. 3-1 authorized Dayspring to enter onto Taylors' house, "supply all equipment and perform all labor necessary to preserve and protect my property from further damage, and to perform all restoration procedures necessary to repair and restore the carpet, furniture, structure and other furnishings."  Ex. 3-1 does not specifically mention the bathtub or cedar paneling.  The second unmarked box on Ex. 3-1, "Charges", includes a provision for attorney fees:  "In the event any legal proceedings must be instituted to recover the amount due, Dayspring Restoration shall be entitled to recover the cost of collection including reasonable attorney's fees."

Banister testified that Dayspring completed the emergency mitigation work and billed Taylors $791.00, which has not been paid, and Mary admitted that Dayspring completed the initial repairs to stop the water leaking.  Mary testified that Banister told her that Ex. 3-1 included the "tear out" and obligated Dayspring to cure the water damage, but that Dayspring did not complete the restoration work because it left damaged tile all over her laundry room which Taylors had to clean up.

On cross examination Mary admitted that she communicated to Dayspring that she

3

wanted it to perform restoration work after tearing out the damage, and that Dayspring was supposed to restore their bathroom to its original condition, but did not.  Ex. 5 is a letter from Dayspring to the Taylors, signed by Banister, dated November 21, 2005.  Ex. 5 itemizes the restoration of the bathroom and laundry room, including labor, and states the total net claim as $7,571.74 at 5-7.  Mary testified that the $7,571.14 on Ex. 5-7 was the total estimate and included the original amount to stop the immediate water damage.  Ex. 5-4 includes a $422.92 charge for 4 days use of a dehumidifier at $105.73 per day.  Ex. 5-4 also lists a $18.00 charge for a containment barrier which Mary testified was never installed.

The last three pages of Ex. 5, 5-9 through 5-11, is a "Contract" for restoration work at Taylors' residence for the amount of $7,571.74, but the Contract is not signed by or on behalf of Taylors or Dayspring.  Mary testified that she and her spouse James went through Ex. 5 but they did not agree with it and both of them told Dayspring that they did not agree with it, although she admitted that she did not disagree with the estimate on Ex. 5.  Banister testified that the restoration Contract beginning at Ex. 5-9 is not signed, and answered "No" when asked on cross examination whether he ever received a signed contract from Taylors for the restoration work.  He testified that Dayspring's mitigation work is separate from its construction business.

Dayspring employees did not perform the restoration work, and instead it hired a subcontractor identified as Roger Lucas ("Lucas").  Banister testified that Lucas was not an employee of Dayspring but rather a subcontractor it has used in the past without complaint, and that if Dayspring had not used a subcontractor the restoration work for Taylors would have been delayed.

Taylors had several complaints about Lucas.  Mary testified that Lucas cut into their wall

and broke their toilet while removing it, that he borrowed James' tools without permission, that Lucas brought his wife to the Taylors' house while he worked and that he kept working at their home after business hours on a Friday night.  She testified that he left damaged tiles on the laundry room floor that James had to carry outside.  Banister admitted that Mary called him and voiced some of their complaints about Lucas, and that he told Lucas that his conduct remaining at Taylors' house after business hours was unacceptable.   Mary testified that she told Dayspring that they were dissatisfied with Lucas, but she was told that they had to "live with" the subcontractor and that Lucas would finish the job.  Instead, Mary testified, Taylors fired Dayspring and hired another contractor identified as Garden City Plumbing & Heating, Inc. ("Garden City") to finish the work.

On cross examination Mary was asked whether she was paid $7,571.74 by her insurance company and answered, "possibly."  Mary testified that approximately $3,500 of the $7,571.74 in insurance proceeds they received was incurred after they fired Dayspring, and that Taylors did not receive a separate check from their insurance company for drying out their property or mitigating the water damage.

The majority of the restoration work involved replacing the bathtub and wood paneling in the Taylors' bathroom.  Taylors objected to Dayspring's work on both projects.

**The Bathtub.**

Mary testified that Dayspring removed their old bathtub and left it in their front yard.  A new bathtub was chosen[3] and installed by Dayspring, but Mary testified on direct examination

---

[3]Mary testified that she went and talked to Ferguson Plumbing after she met with Dayspring and learned that Dayspring had selected the tub.  No evidence to the contrary exists in the record.

5

and on rebuttal that she was not given any choice about the replacement tub.  Banister testified that the policy of the insurance company is to return a bathtub to its pre-loss condition, of like quality and installed without modification, and that the insurer will pay only up to the cost of the original tub.  He testified that Dayspring ordinarily looks at an existing tub and if possible replaces it with the same model.  He testified that he did not think that the same model tub as Taylors' damaged tub existed at the time of the damage, and that Dayspring asked the plumber to estimate the cost of replacing the tub and spent that amount.  Banister admitted that it is the customer's choice to select a bathtub.

Dayspring's Ex. 4 is a fax dated 11/18/05 from Garden City to Banister at DaySpring with specifications for a 60 inch long by 30 inch wide Vickrell tub/shower enclosure.  Banister testified that he did not know whether Ex. 4 represented the first replacement tub, but that the purpose of Ex. 4 was to confirm that the tub would fit in the existing space, which is usually 24 to 26 inches wide.

Mary testified that as of December 1, 2005, the tub still had not been ordered.  She testified that the tub which Dayspring selected and installed was too small, that the plumber had to shorten the wall and their linen closet and install support extensions in order to install the new tub[4].  She testified that Taylors did not agree to or consider installing a smaller tub, and that when an individual she identified as Springer of Dayspring delivered the tub they told him that they were not satisfied with the tub or with the subcontractor Lucas, but Dayspring told them that it

---

[4]She testified that Debtors' Ex. 2 shows the frame of 2 x 4's installed to install the new tub in the old space.  Banister testified that the 2 x 4's were for the existing linen closet/pantry, and was done in accordance with the ordinary standard of care for installation.  He did not know of any effort to shorten the tub.

was their tub whether they liked it or not. Banister did not recall talking to Mary when the new tub was installed, and did not recall when Mary first expressed their dissatisfaction with the tub. Debtors' Ex. 3 is the new tub installed by Dayspring after installation, and Debtors' Ex. 1 is a photograph of James standing in the new tub[5].

Ex. 8 is a fax from Banister to Ken Quattlebaum[6] and Marcie Kessler dated 12/14/05, with specifications for a Kohler bathtub[7] and enclosure which Mary wanted installed, and a request for a price to remove the replacement tub which Dayspring put into Taylors' home and replace it with the Kohler tub. Banister testified that he sent Ex. 8 after Taylors fired Dayspring, and that it was an attempt to satisfy Taylors but not an attempt to resurrect Dayspring as the contractor.

Ex. 12 offered by Dayspring, dated February 1, 2006, is Taylors' letter to Dayspring complaining that their original tub which was removed was a 30 inch wide tub and Dayspring installed a 27 inch[8] wide tub. Mary testified that Taylors had to buy their own tub, and the small replacement tub was taken away by Mike Springer. Ex. 12 states that Taylors told Banister that the replacement tub was unacceptable and Banister commented on 1/17/2006: "As far as I'm concerned you own it and you can use it for a horse trough." Banister testified that he made that

---

[5]James is a large individual, and the photograph of him standing in the tub in Debtors' Ex. 1 is worth a thousand words of explanation why Taylors were dissatisfied with Dayspring's replacement tub. It is far too narrow, and James' feet barely fit inside.

[6]Ex. 5-1 names Quattlebaum as a representative of Allied Insurance.

[7]Ex. 8-3 shows the dimensions of the Kohler tub as 60 inches long by 31 inches wide.

[8]Ex. 12 states the inside dimensions of the replacement tub were only 18 inches wide by 14 inches deep.

statement and admitted that it was inappropriate, but that it was taken out of context and he did not mean to be insulting.  He explained that the 27 inch wide tub which Dayspring purchased was not returnable, and since they owned it Taylors could use it as a horse trough.

In Ex. 12 Taylors state they do not owe Dayspring $5,657.08, and demanded that Dayspring remove the substandard tub, wall wrap and knotted cedar paneling.  Banister testified that Dayspring removed the tub it installed, but that it has not been paid anything.

**Wood Paneling.**

The water leak also damaged the Taylors' cedar wall paneling, which Taylors hired Dayspring to replace.  Banister testified that as wood paneling ages it is very difficult to match, and that Dayspring makes it clear to customers that wood paneling may not match the original paneling.  Mary testified that she was not provided with any disclosure about the difficulty of matching old and new paneling.

Mary testified that Dayspring chose the wood paneling to replace her damaged cedar paneling, that Banister did now show her any wood panel samples, and that Dayspring began installing the new paneling without her consent.  Banister agreed with Mary that the replacement paneling was not equivalent to the original, but testified that he showed samples to Mary and told her that Dayspring would put finish on it to try to bring it as close to the original as it could.  He testified that Mary accepted the replacement paneling and told him it would be satisfactory, and it was on that basis that Dayspring installed the replacement paneling.  Mary disputed Banister's testimony on rebuttal.  She testified that she did not ever meet with Banister to go over wood paneling samples, but instead met with the subcontractor Lucas about the new paneling.

Mary testified that she did not consider the paneling which Dayspring installed as

equivalent to her original, and that she told Dayspring of her dissatisfaction with the replacement paneling[9]. She testified that her cedar paneling did not have stain on it. Mary testified that Dayspring told her that it would not spend extra money for different paneling.

### Taylors Fired Dayspring.

Mary testified that they told Dayspring they did not want the subcontractor Lucas in their house any longer, because he refused to do the work the way they wanted it done and stayed at their house late on a Friday night. Mary testified that after she fired Dayspring she hired Garden City to finish the repairs to their bathroom, and that they had to replace the cedar paneling again[10].

Banister testified that Dayspring was fired. He testified that after it was fired by Taylors Dayspring notified Taylors' insurer that it was removed from the job and was owed $5,567. Ex. 7 is a letter signed by Banister to Taylors on behalf of Dayspring dated December 9, 2005, acknowledging that Taylors did not want Dayspring to continue the restoration work and advising them of Dayspring's invoice in the amount of $5,657.08 for the work it had completed. Ex. 7 informs Taylors that Dayspring notified subcontractors Garden City and Pierce Flooring of their decision to terminate Dayspring and that they should contact them for the remainder of their work. Also in Ex. 7 is the itemization of work from Ex. 5, and Banister testified that the checkmarks next to an item means that Dayspring completed that item and billed for it, but has not received payment. At Ex. 7-4 is the $18.00 charge for containment barrier for demolition of wood which Mary testified was never put up.

---

[9]Debtors' Ex. 4 is a photograph of the replacement wood paneling.

[10]She testified that they chose Mountain Supply as a source for their wood paneling.

Mary testified that Taylors cashed the insurance check and paid others contractor to finish the work.  Banister testified that Taylors met with Springer of Dayspring in January 2006, and Banister's understanding[11] of the outcome of that meeting was that Dayspring would remove the bathtub, Taylors would take over completion of the restoration in exchange for paying Dayspring $3,000.  Mary testified on rebuttal that they had no agreement to settle for $3,000.  She testified that they paid Garden City $1,219.00 for the bathroom repairs, $500 to tile the bathroom, $227 to install a toilet, and other charges which totaled $3,500.  On cross examination Mary testified that she has no receipts for the other approximately $4,000 which was paid by the insurance company.

Dayspring filed a construction lien against Taylors' residence.  Mary testified that the Taylors owe Dayspring nothing because they got no benefit from Dayspring's work, and went 6 months without the use of their bathroom.

Debtors filed their voluntary Chapter 13 petition on March 14, 2008, with their Schedules and Statement of Financial Affairs.  At Schedule B Debtors listed their personal property, and marked "None" on Schedule B at item no. 21 ("Other contingent and unliquidated claims of every nature . . . .") and no. 35 ("Other personal property of any kind not already listed.").  Schedule F lists Dayspring as a creditor with a disputed claim stated in the amount of $950.82.

Dayspring filed Proof of Claim No. 6 on July 28, 2008, asserting a claim for the unpaid balance of the construction work in the amount of $5,657.08, secured by a construction lien.  Debtors filed their objection to Dayspring's claim on August 8, 2008, alleging breach of contract and damages, and that the construction lien was extinguished by Montana statute.  Dayspring

---

[11]Banister testified that he was not at that meeting.

10

filed an amended Proof of Claim No. 6 on August 29, 2008, conceding that its claim is unsecured

but increasing the amount to $8,309.20, plus attorney fees, and including interest in the amount

of $2,652.12 for 954 days, including interest claimed after the date of the filing of the petition,

March 13, 2008, through August 28, 2008, at the rate of $2.78 per day pursuant to MCA § 28-1-

2104.

## DISCUSSION

### I. Objection to Claim – Burden of Proof.

The law on objection and allowance of claims is well settled in the Ninth Circuit and this

Court. This Court discussed the applicable law governing the burden of proof for allowance of

claims in *In re Eiesland*, 19 Mont. B.R. 194, 208-09 (Bankr. D. Mont. 2001):

> A validly filed proof of claim constitutes *prima facie* evidence of the
> claim's validity and amount. F.R.B.P. 3001(f). The Ninth Circuit recently
> explained the general procedure for allocating burdens of proof and persuasion in
> determining whether a filed claim is allowable in *Lundell v. Anchor Const.*
> *Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000):
>
> > A proof of claim is deemed allowed unless a party in interest
> > objects under 11 U.S.C. § 502(a) and constitutes "*prima facie* evidence
> > of the validity and amount of the claim" pursuant to Bankruptcy Rule
> > 3001(f). See also Fed. R. Bankr.P. 3007. The filing of an objection to a
> > proof of claim "creates a dispute which is a contested matter" within the
> > meaning of Bankruptcy Rule 9014 and must be resolved after notice and
> > opportunity for hearing upon a motion for relief. See Adv. Comm. Notes
> > to Fed. R. Bankr.P. 9014.
> >
> > Upon objection, the proof of claim provides "some evidence as to
> > its validity and amount" and is "strong enough to carry over a mere
> > formal objection without more." *Wright v. Holm (In re Holm )*, 931 F.2d
> > 620, 623 (9th Cir.1991) (quoting 3 L. King, Collier on Bankruptcy §
> > 502.02, at 502-22 (15th ed.1991)); *see also Ashford v. Consolidated*
> > *Pioneer Mort. (In re Consol. Pioneer Mort.)*, 178 B.R. 222, 226 (9th Cir.
> > BAP 1995), *aff'd*, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996). To
> > defeat the claim, the objector must come forward with sufficient

11

evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *In re Holm*, 931 F.2d at 623.

\* \* \* \*

"If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *In re Consol. Pioneer*, 178 B.R. at 226 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir.1992)). The ultimate burden of persuasion remains at all times upon the claimant. *See In re Holm*, 931 F.2d at 623.

*See also Knize*, 210 B.R. at 778; *Matter of Missionary Baptist Foundation of America*, 818 F.2d 1135, 1143 (5th Cir.1987); *In re Stoecker*, 143 B.R. 879, 883 (N.D.Ill.1992), *aff'd in part, vacated in part*, 5 F.3d 1022 (7th Cir.), *reh'g denied* (1993).

Thus, the Bank's Proof of Claim No. 2 is *prima facie* evidence of the validity and amount of its claim under Rule 3001(f), and the Debtor has the burden of showing sufficient evidence and to "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell*, 223 F.3d at 1039 (quoting *Holm*). This Court finds that Eric, as the objecting party, has not produced sufficient evidence to cause the burden to revert to the Bank to prove the validity and amount of its claim. *Lundell*, 223 F.3d at 1039 (quoting *In re Consol. Pioneer*, 178 B.R. at 226).

The analysis under *Lundell v. Anchor Const. Specialists* was reiterated by the Ninth Circuit in *In re Los Gatos Lodge, Inc.*, 278 F.3d 890, 894 (9th Cir. 2002).

Applying this analysis to the instant case, Debtors' initial burden to overcome the *prima facie* effect of the validity and amount of Dayspring's Claim No. 6 under Rule 3001(f) is lessened by Dayspring's amendment of its original claim and its admission that its construction lien is invalid. Furthermore, Dayspring's amended claim includes interest for the period after the date of the filing of the petition.

Debtors argue that they overcame the prima facie validity of Dayspring's Proof of Claim

12

because of Dayspring's admissions, amendment to withdraw its secured claim, lack of written agreement and Mary's testimony of defective performance by Dayspring's subcontractor.  The Court agrees, and finds these constitute facts tending to defeat Dayspring's claim by probative force equal to that of the allegations of the proof of claim itself.  *Lundell*, 223 F.3d at 1039.  The Court finds that Debtors satisfied their burden to overcome the *prima facie* effect of Dayspring's claim, and the ultimate burden thus reverts to Dayspring to prove the validity and amount of its claim by a preponderance of the evidence.  *Lundell*, 223 F.3d at 1039.  Dayspring must prove that it has a "right to payment", 11 U.S.C. § 101(5)(A).

**II.  Postpetition Interest – 11 U.S.C. § 502(b)(2).**

Dayspring's amended claim includes total interest due in the amount of $2,652.12 for 954 days, including interest claimed after the date of the filing of the petition, March 13, 2008, through August 28, 2008, at the rate of $2.78 per day.  Unmatured postpetition interest may not be allowed, as of the date of filing of the petition, as part of a creditor's claim in bankruptcy proceedings under § 502(b)(2).  *In re Foster*, 319 F.3d 495, 497 (9th Cir. 2003);  *Miller v. Snavely*, 19 Mont. B.R. 300, 322-323 (Bankr. D. Mont. 2002); *In re England*, 15 Mont. B.R. 154, 155 (Bankr. D. Mont. 1996); *Leeper v. Pennsylvania Higher Education Assistance Agency*, 49 F.3d 98, 101 (3rd Cir. 1995) (citing *Sexton v. Dreyfus*, 219 U.S. 339, 344, 21 S.Ct. 256, 257, 55 L.Ed. 244 (1911)).

An oversecured creditor may claim interest and attorney fees under 11 U.S.C. § 506(b).  *See In re Kord Enterprises II*, 139 F.3d 684, 687, 689 (9th Cir. 1998).  However, Dayspring admitted that its construction lien is invalid and that it has an unsecured claim, so it cannot claim interest as an oversecured creditor under § 506(b).  Dayspring also has not claimed postpetition

13

interest based on a nondischargeable debt as discussed in *Foster*, 319 F.3d at 497-98, and *England*, 15 Mont. B.R. at 155, or on any other grounds. Although Debtors did not object to Dayspring's claim based on the postpetition interest, § 502(b)(2) is mandatory that postpetition unmatured interest may not be allowed. Thus, Dayspring's amended claim is overstated.

Mont. Local Bankruptcy Rule ("LBR") 3007-1 provides: "Overstated Proofs of Claim. A proof of claim found to be knowingly overstated or false as to any material item may be disallowed in its entirety by the Court, after hearing." *Miller v. Snavely*, 19 Mont. B.R. 300, 342 (Bankr. D. Mont. 2002). Dayspring's amended Claim No. 6 is signed by its attorney Hansberry, who has experience appearing in this Court. A person who has consulted with an attorney "can be charged with constructive knowledge of the law's requirements." *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050 (9th Cir.1987). For Dayspring's assertion of postpetition interest on an unsecured claim, the Court has the discretion to reject Dayspring's Proof of Claim *in toto*. *Miller v. Snavely*, 19 Mont. B.R. at 342.

**III. Prompt Payment Act**.

Debtors argue that Dayspring admitted Debtors' objection to its secured claim when it filed its amended claim for an unsecured claim based on Montana's Prompt Payment Act, MCA § 28, Chapter 2, Part 21, and that the Prompt Payment Act is not applicable to the contract between the parties because MCA § 28-2-2107 exempts from the Prompt Payment Act residential projects with a total cost of less than $400,000. Debtors further argue that the Prompt Payment Act only applies to a construction contract which is statutorily defined as a written agreement, and that Banister admitted that the written contract in Ex. 5 was never signed, and none of the boxes on Ex. 3, which was signed by the parties, were checked.

14

Dayspring admits that its construction lien was not valid, but argues that Debtors objections came too late under Montana's Prompt Payment Act, § 28-2-2103(1)(b) because they did not object to Dayspring's invoice for 74 days, and therefore Dayspring is entitled to the amount of its invoice, 18 percent (18%) interest and its costs and attorney fees.

Part 21 of MCA Title 28, Chapter 2, is entitled "Payment of Construction Contractors and Subcontractors." Section 28-2-2102 provides in pertinent part: "Performance entitles contractor or subcontractor to payment. (1) Performance by a contractor of a construction contract in accordance with the provisions of the contract entitles a contractor to payment from the owner." "'Construction contract' means a written agreement between an owner and a contractor for the contractor to construct or improve or to provide construction management for the construction or improvement of an improvement to real property." Mont. Code Ann. § 28-2-2101(1); *Weimar v. Lyons,* 2007 MT 182, ¶ 52, 338 Mont. 242, 257-58, ¶ 52, 164 P.3d 922, 933, ¶ 52 (2007). "'Contractor' means a person who has signed a construction contract with an owner." § 28-2-2101(2).

Section 28-2-2103(1)(b) provides in pertinent part that "a contractor's request for payment is considered approved by the owner 21 days after receipt of the request by the owner or the person designated in the contract by the owner to receive the payment request unless, prior to that time, the owner provides the contractor with a written statement containing specific items in the request for payment that are being disapproved by the owner." Dayspring argues that the Debtors failed to provide it with a written statement containing specific items of which they disapproved, and therefore their objections were too late and barred under § 28-2-2103(1)(b) and they should be deemed to have accepted the full invoice amount of $5,657.08 from Ex. 7-1.

15

Banister admitted that Dayspring did not sign a written agreement with the Taylors for the restoration services.  The contract which is at Ex. 5-9 to -11, which would have covered the repairs and replacement of the bathtub, paneling, tile and other water damage, is not signed and no other signed written agreement exists between the parties.

The only signed agreement between the parties, Dayspring's Ex. 3-1, was prepared by Dayspring and therefore any ambiguity is construed against the drafter.  *Corporate Air v. Edwards Jet Center*, 2008 MT 283, ¶ 32, 345 Mont. 336, 349, ¶ 32, 190 P.3d 1111, 1121, ¶ 32. Mary did sign Ex. 3-1 along with Banister, and Dayspring argues that Ex. 3-1 clearly provides for restoration services necessary to repair and restore the carpet, furniture, structure and other furnishings.  However, none of the three boxes on Ex. 3-1 are marked, and Banister admitted in his testimony that no written agreement exists between the parties for the replacement of the bathtub and other restoration work.  The fact that Dayspring requested the Taylors to sign the contract attached at the end of Ex. 5, which by its terms on 5-9 covers the work as specified in the estimate of November 21, 2005, after the emergency mitigation work was complete, and Banister's testimony that Dayspring keeps its emergency mediation work separate from its construction work and that no written agreement was signed by Taylors for the bathtub, paneling and other restoration, supports a finding that the parties agree the scope of the original contract, Ex. 3-1, was for the emergency remediation services and was not for the restoration work.

Therefore the Court concludes that Ex. 3-1 was intended to cover only the emergency remediation of the water leak, tear out and drying out and not the restoration of the bathtub, wall paneling and tile.  The amount of the remediation services was shown by the evidence to be $791.00, less the $18.00 charge for containment barrier for demolition of wood that Mary

16

testified was never put up, for a total of $773.00.

Dayspring's reliance on § 28-2-2103(1)(b) to bar Debtors' objections to its invoice of $5,567.08 as untimely fails, with respect to the bathtub, paneling, and other reconstruction work, because with respect to the post-remediation work Dayspring is not a "contractor" as defined at § 21-2-2101(2) because it had not signed a written construction contract with the Taylors. Dayspring argues that its rights under the Prompt Payment Act should not be so easily defeated by an owner accepting the benefit of the contractor's labors but neglecting to sign the written document.  However the Court concludes the plain language of the statute requires a contrary result.  Sections 28-2-2101(1) and (2) clearly require a "written agreement" with a contractor "who has signed a construction contract with an owner".  This Court is not persuaded that § 28-2-2103(1)(b) applies to the bathtub, paneling and other restoration work, and thus because of the lack of a written agreement between Dayspring and Taylors, Taylors are not time-barred by § 28-2-2103(1)(b).

Debtors cite § 28-2-2107 for the $400,000 minimum amount for Part 21 to apply. Section 28-2-2107 provides:  "Exception for certain residential dwellings.  The provisions of this part do not apply to residential projects or improvements to real property intended for residential purposes with a total cost of less than $400,000."  The Montana Supreme Court construed § 28-2-2107 and concluded from a "plain reading" of that section, "that the exception applies to a construction contract between an owner and contractor for an improvement to residential real property with a total cost of less than $400,000."  *Weimar v. Lyons,* ¶ 53.  Dayspring's contract with the Taylors was for less than $400,000, so the interest statute on which Dayspring cites as authority for its claim for interest on its claim, § 28-2-2104, as well as other provisions of the

17

Prompt Payment Act, do not apply. *Weimar v. Lyons,* ¶ 53. Debtors' objection to Dayspring's claim for interest must therefore be sustained.

### IV. Breach of Contract.

Debtors argue that Dayspring breached its contract with them by replacing their tub with a smaller tub instead of restoring the tub to its original condition, by replacing their clear cedar paneling with inferior paneling, and using an incompetent subcontractor and refusing to correct their work. Dayspring argues that Banister informed Taylors of the limitations of replacement cost and dimensions for a replacement tub and believes that Dayspring followed its practice with the Taylors. Debtors note that Banister admitted that Dayspring's subcontractor used Debtors' tools and that his working after business hours was unacceptable, and that Banister did not dispute that Dayspring refused their demands to replace the subcontractor. Dayspring contends that it resolved Taylors' complaint against Roger by speaking with him and that no further problems occurred. Debtors argue that Dayspring did not rebut Mary's testimony that Debtors used all the insurance money they received to complete the restoration in a workmanlike manner, and are entitled to offsets for their labor, tools and inconvenience caused by Roger which deprived them of their bathroom for 6 months.

Based on the evidence regarding the undersized bathtub and the Taylors' complaints about the paneling, the Court agrees with the Debtors that the quality of work performed by the subcontractor and Dayspring was unacceptable and a breach of the agreement. Dayspring contends that it was constrained by the industry practice to contain the cost of replacement. However, Banister admitted that it was the Taylors' right to choose the bathtub, and to restore the bathtub to original condition. Dayspring's own evidence, Ex. 12-1 shows that the replacement

18

tub Dayspring chose was more than 5 inches narrower than the original tub, and Banister's response was that they could use it as a horse trough.

### V. $3,000 Agreement/Unjust Enrichment.

Debtors contend that Banister's testimony of an agreement between Mark Springer and Taylors to resolve the dispute by Dayspring taking back the tub in return for $3,000, warrants disallowance of Dayspring's claim in its entirety under Mont. LBR 3007-1.  Debtors contend that Dayspring's amended claim was knowingly overstated by adding interest on the basis of MCA § 28-2-2104 of the Prompt Payment Act and in excess of the agreement to settle for $3,000. Dayspring argues that it lived up to its obligation under the agreement to settle for $3,000 and Taylors never paid them any amount from the $7,571.74 in insurance proceeds.  Dayspring argues that Taylors could only substantiate spending $2,888 of the insurance proceeds, and that because they were not paid anything they should be allowed their claim based on its original invoice, and that disallowing its claim would result in unjust enrichment of the Taylors because Taylors accepted the benefit of Dayspring's work, but kept $4,071 in insurance proceeds above the $3,500 in expenses which Taylors incurred to complete the restoration.

The Court concluded above that Dayspring's amended claim was knowingly overstated in violation of LBR 3001-7.  Debtors deny that an agreement exists to settle for $3,000, but on the other hand Debtors' counsel did not object or move to strike Banister's hearsay testimony about the agreement.

The equitable principle of unjust enrichment is discussed at length in *Lawrence v. Clepper* (1993), 263 Mont. 45, 53, 865 P.2d 1150, 1156:

It is defined as the unjust retention of a benefit to the loss of another, or the

retention of money or property of another against the fundamental principles of justice or equity and good conscience. A person is enriched if he has received a benefit, and he is unjustly enriched if retention of the benefit would be unjust. Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another.

Dayspring argues that the Debtors would be unjustly enriched by keeping all of the insurance proceeds. However, Taylors were the insured parties, and the proceeds they received, $7,571.74, was the amount of Dayspring's estimate at Ex. 5-7 to complete the reconstruction, including the remediation. From that amount Taylors had to purchase and replace the bathtub and paneling that Dayspring had installed, and pay for the flooring and complete the other reconstruction of their water-damaged home. The burden of proof is on Dayspring, not on the Debtors. The Court does not understand how the retention by the Debtors of the full amount of the insurance estimate by Dayspring to complete their repairs constitutes unjust enrichment.

Furthermore, fundamental maxims of equity include: "one seeking equity must do equity", *In re Marriage of Cox*, 266 Mont. 67, 71, 878 P.2d 903, 906 (1994); and "[p]arties must not expect relief in equity, unless they come into court with clean hands." *In re Marriage of Burner*, 246 Mont. 394, 397, 803 P.2d 1099, 1100 (1991); *Mitchell v. Leland Co.* (9th Cir.1917), 246 F. 103, 107; *see also Fey v. A.A. Oil Co.* (1955), 129 Mont. 300, 318, 285 P.2d 578, 587; *Tomsheck v. Doran* (1953), 126 Mont. 598, 607, 256 P.2d 538, 543; *Perry v. Luding* (1950), 123 Mont. 570, 591, 217 P.2d 207, 218. In the Court's estimation Dayspring does not come into court with clean hands.

Dayspring failed to allow Taylors to choose the replacement tub, as was their right, failed to restore the tub to its original condition per industry practice, and the performance of its subcontractor was unacceptable in several respects and was brought to Dayspring's attention by

20

Taylors.  Dayspring's response, and its policy of customer satisfaction as demonstrated by the evidence, was in effect:  "Like it or lump it."  The Court concludes that Dayspring failed to satisfy its burden of proof that Debtors agreed to settle for $3,000 or that allowing the Debtors to keep their insurance payment in the amount of Dayspring's repair estimate constitutes unjust enrichment.

### VI. Attorney Fees.

Both sides request attorney fees.  Debtors request attorney fees and costs as the prevailing party under MCA §§ 71-3-124 and 28-2-2105.  Dayspring argues that Montana's "American Rule" prohibits an award of attorney fees to Debtors because they are not allowed by statute or contract, but that Dayspring is allowed attorney fees and costs under § 21-2-2105.

No general right to recover attorney's fees exists under the Bankruptcy Code.  *Renfrow v. Draper*, 232 F.3d 688, 693 (9th Cir.2000); *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441 (9th Cir.1997).  The Montana Supreme Court stated Montana law in *Harding v. Savoy*, 2004 MT 280, ¶ 68-69, 323 Mont. 261, 277-78, ¶ 68-69, 100 P.3d 976, 986-87, ¶ 68-69 as follows:

> The longstanding rule in Montana, also known as the American Rule, is absent a contractual or statutory provision to the contrary, attorney fees will not be awarded to the prevailing party in a lawsuit. *Pankratz Farms, Inc. v. Pankratz*, 2004 MT 180, ¶ 93, 322 Mont. 133, ¶ 93, 95 P.3d 671, ¶ 93 (citing *Erker v. Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, ¶ 43, 988 P.2d 1221, ¶ 43). In the present case, neither a statutory nor contractual basis for an award of attorney fees exists; however, in rare instances a district court may award attorney fees to an injured party under its equity powers. *Pankratz*, ¶ 93 (citing [*Foy v. Anderson* (1978), 176 Mont. 507, 511-12, 580 P.2d 114, 116-17.]
>
> ¶ 69 We have recognized equitable exceptions to the American Rule. See, e.g., *Mt. W. Farm Bureau Mut. Ins. Co. v. Hall*, 2001 MT 314, ¶ 14, 308 Mont. 29, ¶ 14, 38 P.3d 825, ¶ 14 (awarding attorney fees when a party incurs legal fees to establish a common fund which avails non-participating beneficiaries); *Montanans for the Responsible Use of the School Trust v. State ex rel. Bd. of Land*

*Commr's*, 1999 MT 263, ¶ 67, 296 Mont. 402, ¶ 67, 989 P.2d 800, ¶ 67 (awarding attorney fees pursuant to the private attorney general theory). In addition, we have awarded attorney fees when a party has been forced to defend against a wholly frivolous or malicious action. *Foy*, 176 Mont. at 511, 580 P.2d at 117. However, such awards are determined on a case-by-case basis. *Pankratz*, ¶ 93 (citing *Foy*, 176 Mont. at 511, 580 P.2d at 117). We have specifically declined to adopt a malicious or bad faith equitable exception to the American Rule. *Goodover v. Lindey's* (1992), 255 Mont. 430, 448, 843 P.2d 765, 776; *Erker*, ¶ 44. Further, we have held where a party chooses to institute a suit against others, an award of attorney fees to the plaintiff will normally be precluded. *Goodover*, 255 Mont. at 447, 843 P.2d at 775; *Youderian Constr. v. Hall* (1997), 285 Mont. 1, 15, 945 P.2d 909, 917.

*See also Trustees of Indiana University v. Buxbaum*, 2003 MT 97, ¶ 19, 315 Mont. 210, 215-16, ¶ 19, 69 P.3d 663, 666-67, ¶ 19; *see also, Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 97, 303 Mont. 274, 305, ¶ 97 16 P.3d 1002, 1022, ¶ 97; *Hickingbotham v. Duncan* (1995), 271 Mont. 525, 531, 898 P.2d 1215, 1219; *Ehly v. Cady* (1984), 212 Mont. 82, 687 P.2d 687.

In *Schuff*, the court quoted the United States Supreme Court holding that: "[T]he argument that attorneys' fees must be added to a plaintiff's recovery if the award is truly to make him whole is contrary to the generally applicable American Rule." *Schuff* ¶ 97, *quoting Norfolk & Western Ry. Co. v. Liepelt* (1980), 444 U.S. 490, 495, 100 S.Ct. 755, 758, 62 L.Ed.2d 689. Pursuant to *Foy v. Anderson* (1978), 176 Mont. 507, 580 P.2d 114, an exception exists in Montana where a court has equitable power to enter such an award subject, however, to a caveat placed on the equitable power that the case must involve a "frivolous or malicious action". *Buxbaum*, ¶ 13.  The court in *Erker v. Kester*, 1999 MT 231, ¶ 44, 296 Mont. 123, 135, ¶ 44, 988 P.2d 1221, 1228, ¶ 44, further distinguished *Foy* and its progeny by stating that "[t]he *Foy* exception has been narrowly drawn and is applicable only where the action into which the prevailing party has been forced is utterly without merit or frivolous," and "only in cases with

22

particularly limited facts."  (Quoting *Goodover v. Lindey's, Inc.* (1992), 255 Mont. 430, 446-47,

843 P.2d 765, 775-76).  The instant case involves Dayspring simply filing a proof of claim,

which, albeit overstated, does not in this view constitute the "particularly limited facts" to depart

from the American Rule.

Debtors' claim for attorney fees and costs under MCA § 71-3-124, involving foreclosure

of construction liens[12], may be disposed of quickly.  Dayspring argues that MCA § 71-3-124 does

not apply because it was not attempting to foreclose a construction lien, and the Court agrees.

The instant contested matter is not "an action to foreclose" a construction lien.  Dayspring filed a

proof of claim in this case, to which Debtors objected.  That in no way constitutes an "action to

foreclose a" construction lien under Montana law.  Further, in amending its claim Dayspring

waived its construction lien, so § 71-3-124 simply is not invoked and does not apply.  Debtors'

objection invokes § 502(b) ("Allowance of Claims or Interests") to determine the amount of such

claim under any agreement or applicable law, but Dayspring's claim, especially after amendment,

in no way constituted an action to foreclose a construction lien.

The Debtors argue that Dayspring's amendment to its claim made no difference and they

are entitled to reciprocal award of attorney fees, but since Dayspring surrendered its construction

lien before hearing none of the attorney fees and costs incurred by Debtors to participate in the

hearing had anything to do with enforcement or foreclosure of the construction lien.

Next Debtors claim attorney fees and costs pursuant to MCA § 28-2-2105, which

---

[12]Section 72-3-124(1) provides:  "In an action to foreclose any of the liens provided by part 3, 4, 5, 6, 8, or 10 of this chapter, the court shall allow as costs the money paid and attorney fees incurred for filing and recording the lien and reasonable attorney fees in the district and supreme courts.  The costs and attorney fees must be allowed to the defendant against whose property a lien is claimed if the lien is not established."

provides:

> Prevailing party entitled to costs and attorney fees.  In a civil action on a contract to enforce an obligation imposed by this part, the prevailing party is entitled to reasonable attorney fees and costs, both for trial and appeal.  If the parties to a construction or subcontract use arbitration, the arbitrator may award fees and costs as the arbitrator may determine.

Dayspring argues that Dayspring met its obligations under the Prompt Payment Act by providing a written invoice and contract to Taylors, and that MCA § 28-2-2105 is not a general attorney fee statute to award Taylors attorney fees under their breach of contract claim.  Debtors' claim for attorney fees and costs under Title 28, Chapter 2, Part 21, fail for the same reasons they raised as defenses.  Section 28-2-2105 entitles a prevailing party in an action to enforce an obligation "imposed by this part" to attorney fees and costs.  Debtors above successfully showed that Dayspring's claim is not "an obligation imposed by this part".  No written agreement as required by § 28-2-2101(1) existed for the replacement of the bathtub, paneling and other reconstruction, and the total cost of the project is far less than $400,000.  Therefore pursuant to § 28-2-2107 "[t]he provisions of this part do not apply."  Since Title 28, Chapter 2, Part 21 does not apply to the obligation, neither Debtors nor Dayspring are entitled to attorney fees under § 28-2-2105.

Similarly, Debtors' objection to Dayspring's Proof of Claim is not a civil action to enforce an obligation.  The instant contested matter is not an adversary proceeding, but rather a contested matter under F.R.B.P. 3007(a) to fix the amount of Dayspring's allowed claim, if any.  By requesting affirmative relief in the form of damages, attorney fees and costs, Debtors invoked the new F.R.B.P. Rule 3007(b) which took effect on December 1, 2007:  "Demand for Relief Requiring an Adversary Proceeding.  A party in interest shall not include a demand for relief of a

24

kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."  Debtors' request to recover attorney fees and costs requires an adversary proceeding, and since they have not initiated an adversary proceeding under Rule 7001 their request for attorney fees and costs must be denied on procedural grounds.

The original contract, Dayspring's Ex. 3-1, contains an attorney fee provision for the prevailing party, but Dayspring did not invoke that provision as grounds for an award of attorney fees and costs.  Moreover, because Dayspring's amended claim was knowingly overstated by including postpetition interest the Court will not award it attorney fees and costs and will limit Dayspring's allowed claim to the sum of $773 shown by the record for its completed emergency remediation.  Neither side can be said to be the prevailing party because both have prevailed in part.  Debtors' objection to Dayspring's claim will be sustained in part because Dayspring's claim is overstated, but Debtors admit that Dayspring completed the initial remediation work by stopping the leak, tearing out damaged tub, tile and paneling and drying out the damaged area. Instead of awarding attorney fees and costs to both sides as prevailing parties, the Court will deny the parties' requests for attorney fees and costs and they will be responsible each for their own under the American Rule.

### CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this case under 28 U.S.C. § 1334(a).

2.  Debtors' objection to allowance of Dayspring's claim against the estate is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

3.  Debtors satisfied their initial burden of proof under Rule 3001 to defeat the prima facie effect of Dayspring's amended Proof of Claim No. 6, and the burden reverted to Dayspring

to prove the validity of its claim by a preponderance of the evidence.

4.  Dayspring knowingly overstated its amended Claim No. 6 by including postpetition interest which is not allowed under § 502(b)(2) for an unsecured claim.  This Court has the discretion to disallow Dayspring's overstated claim *in toto* under Mont. LBR 3007-1.

5.  The provisions of Montana's Prompt Payment Act do not apply because Dayspring is not a contractor which has signed a written construction contract with an owner as required by §§ 28-2-2101(1) & (2).  The total cost of the residential project or improvement to Debtors' real property is less than $400,000 and thus pursuant to § 28-2-2107 the time limitation provision of § 28-2-2103(1)(b), interest provision of § 28-2-2104, and attorney fee provision of § 28-2-2105, all do not apply.

6.  Dayspring breached its agreement with the Debtors by improperly installing an undersized bathtub, by unacceptably replacing wood paneling, and by inadequately supervising its subcontractor.  No agreement to settle the parties' dispute for the sum of $3,000 existed.

7.  Dayspring failed its burden to prove the equitable principle of unjust enrichment, and Dayspring failed to come into court with clean hands.

8.  The Debtors failed to follow correct procedure under F.R.B.P. 3007(b) by including in their objection a demand for attorney fees and costs, rather than including their objection in an adversary proceeding.

9.  Under Montana's American Rule both sides shall pay their own attorney fees and costs.

10.  The net amount of Dayspring's allowed claim shown by the evidence is $773.00.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above

sustaining in part the Debtors' objection to Dayspring's amended claim; allowing Dayspring an

unsecured nonpriority claim in the amount of $773.00; and denying both sides' requests for

attorney fees and costs.

BY THE COURT

*Ralph B. Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana